# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**DELORES JEAN BLUE,**

        **Plaintiff,**

        v.                             Case No. 05-C-755

**ALPHONSO JACKSON,**
**Secretary of United States Department of**
**Housing and Urban Development,**

        **Defendant.**

## DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On July 18, 2005, Delores Jean Blue ("Blue"), proceeding pro se, filed a complaint alleging that she was wrongfully terminated from her position with the United States Department of Housing and Urban Development ("HUD") for "'excessive absence due to medical reasons,' discriminated against and denied reasonable accommodation as a qualified individual with disabilities." (Docket No. 1 at 3.) Accompanying Blue's complaint was a motion to proceed in forma pauperis, (Docket No. 2), and a motion for the appointment of counsel, (Docket No. 3). The court granted Blue's motion to proceed in forma pauperis but denied Blue's motion for the appointment of counsel. (Docket No. 4.)

On April 17, 2006, the defendant answered the complaint. Blue subsequently obtained counsel to represent her in this matter. The court permitted Blue to amend her complaint, which she did on July 20, 2006. (Docket No. 20.) On February 28, 2007, the defendant moved for summary judgment. (Docket No. 30.) Blue responded, (Docket No. 40), and the defendant has replied,

(Docket No. 42). The pleadings on the defendant's motion are closed and the matter is ready for resolution. All parties have consented to the full jurisdiction of a magistrate judge.

## FACTS

Blue began working for HUD in Milwaukee as a clerk typist in 1989. (Blue Dep. 11-12.) Blue became a permanent HUD employee in 1990. (Blue Dep. 13.) Blue began experiencing psychological problems in 1990 or 1991. (Blue Dep. 29.) As a result of these problems, Blue was off work for a period of time. (Blue Dep. 29.) In the mid-1990s, HUD underwent a reorganization wherein all persons employed in Blue's position were promoted to the position of Program Support Assistant. (Blue Dep. 14-15.)

Blue developed carpal tunnel syndrome in 1992. (Blue Dep. 25.) Blue received cortisone injections, and these injections resolved her problems until 1998. (Blue Dep. 25-26.) In 1998, Blue's carpal tunnel problems recurred and Blue underwent three surgeries for her right wrist and two for her left wrist. (Blue Dep. 26.) At this time her doctor gave her permanent restrictions relating to her carpal tunnel syndrome. (Blue Dep. 30.) Blue was off work for a period of time and upon returning to work, Blue continued to experience soreness. (Blue Dep. 26-28.) Blue took further leave as a result of her continued carpal tunnel syndrome problems, rotator cuff bursitis, and tendonitis in her elbow. (Blue Dep. 32.) Stress also contributed to her need for leave at this time. (Blue Dep. 32-33.) These periods of leave ranged from a few hours to one or two weeks. (Blue Dep. 32-34.)

Shortly after her surgery in 1998, Blue began to experience knee pain, (Blue Dep. 45), for which she received cortisone injections, (Blue Dep. 46). Blue experienced knee pain when she sat for long periods of time and she still suffers from these problems. (Blue Dep. 49.) As a result of this knee pain, Dr. Neni, Blue's primary physician, stated Blue was "disabled" and could not return to work until she saw Dr. Gogan regarding problems she was experiencing with her throat. (Blue Dep.

47.) On March 2, 2000, Blue saw Dr. Gogan regarding problems with her throat where she was hoarse and unable to talk. (Blue Dep. 51.)

By the end of January, 2000, Blue had exhausted all of her accrued sick leave and annual leave, and beginning on January 28, 2000, various doctors told Blue that she was unable to work, (Blue Dep. 34). Blue never returned to work at HUD and was terminated effective June 20, 2001. (Johnson Dec. ¶11; Blue Dep. 19.) At the time of her termination, Blue was suffering from bilateral carpal tunnel syndrome, tendonitis in her wrist, and a mental disorder. (Blue Dep.21-22.)

During the period preceding Blue's termination, numerous written communications occurred between Blue, her doctors, and HUD regarding Blue's medical conditions and the prospect that Blue would return to work. Dr. Neni wrote on January 27, 2000 that Blue was disabled because of a cough and on February 17, 2000 wrote that she was disabled until she had an appointment with Dr. Gogan because of knee pain. (Blue Dep. Ex. 1, Docket No. 32-3 at 1.) Blue also suffered from anemia and this prevented her from working from February 9, 2000 to February 14, 2000. (Blue Dep. 49.) On March 2, 2000, Blue began treatment for depression. On March 9, 2000 Dr. Ulrich wrote, "For medical reasons Delores Blue is unable to return to work until further notice." (Blue Dep. Ex. 1, Docket No. 32-3 at 4; Blue Dep. 52.)

On April 3, 2000, Lorraine Griscavage-Frisbee ("Griscavage-Frisbee"), Blue's supervisor, wrote that Blue had accrued more than 350 hours of leave without pay ("LWOP") from January 1, 2000 through March 31, 2000. (Blue Dep. Ex. 2, Docket No. 32-3 at 6.) In this letter, Griscavage-Frisbee notes that some of these requests for leave were properly made while others were not. (Blue Dep. Ex. 2, Docket No. 32-3 at 6.) Griscavage-Frisbee further notes that most of the medical certifications Blue has provided have been inadequate and do not note that Blue is unable to work. (Blue Dep. Ex. 2, Docket No. 32-3 at 6.) Because the information provided to HUD indicated that Blue would be away from work for an indefinite period of time and may never be able to return to

work, Griscavage-Frisbee requested that Blue have a physician provide HUD (1) the history of the specific medical condition; (2) a detailed explanation as to why Blue is unable to work; (3) an assessment of the current clinical status and plans for future treatment; (4) Blue's diagnosis; (5) an estimated date of full or partial recovery; and (6) and explanation as to how the medical condition would affect Blue's ability to perform her specific work duties and an expected date of return to full duties. (Blue Dep. Ex. 2, Docket No. 32-3 at 6.) Griscavage-Frisbee included a copy of Blue's position description in order to assist her physician in evaluating the demands of Blue's job. (Blue Dep. Ex. 2, Docket No. 32-3 at 6.) Griscavage-Frisbee stated that this information must be received by April 14, 2000, and thus Griscavage-Frisbee placed Blue on LWOP until that date. (Blue Dep. Ex. 2, Docket No. 32-3 at 6.) If Blue fails to provide the requested information by April 14, 2000, she is instructed to telephone Griscavage-Frisbee or another HUD employee. (Blue Dep. Ex. 2, Docket No. 32-3 at 6.)

On April 12, 2000, Dr. Steven Ulrich ("Dr. Ulrich"), Blue's primary physician, and Kathryn Ford ("Ford"), Blue's therapist, provided a letter to Griscavage-Frisbee wherein they stated that Blue began treatment for major depression on March 2, 2000 and this depression along her "unresolved issues with [HUD] concerning [her] experience and her belief in fair labor practices for employees who need help both medically and psychologically" prevents her from returning to work. (Blue Dep. Ex. 4, Docket No. 32-3 at 22-23.) In this letter, Dr. Ulrich and Ford state that her estimated date of recovery is "indefinite at this time." (Blue Dep. Ex. 4, Docket No. 32-3 at 23.)

On May 1, 2000 Blue requested leave without pay from May 1, 2000 to July 3, 2000, stating "This is approximately time needed for medical care." (Blue Dep. 53; Blue Dep. Ex. 1, Docket No. 32-3 at 5.) Blue requested this leave because of bronchitis, anemia, knee pains, hand problems, and a mental disorder. (Blue Dep. 54.)

4

On May 2, 2000, Ben Detterman ("Detterman"), who replaced Griscavage-Frisbee as Blue's supervisor, wrote to Blue stating that the information that HUD had received was incomplete as to Griscavage-Frisbee's request for information and again asked that Blue's medical professionals provide additional information regarding her treatment, an estimated recovery time, and what sort of accommodations HUD may be able to offer. (Blue Dep. Ex. 3, Docket No. 32-3 at 21.) Detterman states, "Our goal is to reach an accommodation that will enable you to perform the essential duties of your position." (Blue Dep. Ex. 3, Docket No. 32-3 at 21.)Detterman further extended Blue's LWOP through May 31, 2000 and informed Blue that she must contact HUD if she has not provided an appropriate response by this date. (Blue Dep. Ex. 3, Docket No. 32-3 at 21.)

On June 1, 2000, Blue contacted Detterman and stated that her doctors were unable to complete the medical certification on time because they had been out of town. (Blue Dep. Ex. 6, Docket No. 32-3 at 25.) Also at this time, Blue requested that she be granted LWOP through August 25, 2000. (Blue Dep. Ex. 6, Docket No. 32-3 at 25.)

On June 13, 2000, Dr. Ulrich and Ford responded by stating they believed that they had been comprehensive in previously explaining Blue's conditions and again stated that Blue is unable to perform her work duties because of depression. (Blue Dep. Ex. 5, Docket No. 32-3 at 24.) They further stated that this depression "impairs her from returning to work in the foreseeable future [and] we believe that the absence of labor reconciliation is a direct impediment to her mental health recovery." (Blue Dep. Ex. 5, Docket No. 32-3 at 24.)

On June 19, 2000, Detterman wrote to Blue stating that he was unable to approve her continued absence from work "without definitive medical information that supports your inability to perform the duties of your position." (Blue Dep. Ex. 6, Docket No. 32-3 at 25.) Detterman stated that he was unable to approve Blue's request for leave until August 25, 2000 but did approve leave until July 3, 2000 so that Blue could submit appropriate medical information. (Blue Dep. Ex. 6,

5

Docket No. 32-3 at 25.) If Blue failed to present appropriate medical documentation by that date, Detterman stated that he expected Blue to be at work on July 5, 2000. (Blue Dep. Ex. 6, Docket No. 32-3 at 25.) If Blue failed to provide adequate medical documentation by July 3 and did not report to work on July 5, Detterman stated that Blue would be considered to be absent without leave (AWOL), and this may be the basis for disciplinary actions including removal from federal service. (Blue Dep. Ex. 6, Docket No. 32-3 at 25.) At the time Detterman sent this letter he had not yet received the letter from Dr. Ulrich and Ford dated June 13, 2000. (Detterman Dec. ¶12, Docket No 35 at 3.)

In a letter dated June 28, 2000, and addressed to Griscavage-Frisbee, Dr. Kroner stated that he has treated Blue for certain orthopedic or musculoskeletal problems which led to his imposing permanent restrictions on her. (Blue Dep. 79; Blue Dep. Ex. 7, Docket No. 32-3 at 25.) However, Dr. Kroner stated, "I believe that she is capable of working and I have not authorized her being off work during this time." (Blue Dep. Ex. 7, Docket No. 32-3 at 26.) Thus, during this time, Blue was precluded from working not because of her physical limitations but rather because of mental health limitations. (Blue Dep. 80.)

In a letter dated June 30, 2000, Detterman wrote to Blue stating that he has received the letter from Dr. Ulrich and Ford and that he will accept this letter as a basis for approving leave through September 1, 2000. (Blue Dep. Ex. 9, Docket No. 32-3 at 28.) Detterman reminded Blue that she has not yet provided "an estimate of the approximate date of full or partial recovery and an explanation of the impact of the medical condition on the job, including specific duty restrictions." (Blue Dep. Ex. 9, Docket No. 32-3 at 28.) Detterman informed Blue that she must provide this information by July 31, 2000. (Blue Dep. Ex. 9, Docket No. 32-3 at 28.) Detterman further informed Blue that she must provide by September 1, 2000 the additional medical information that was previously requested. (Blue Dep. Ex. 9, Docket No. 32-3 at 28.) If Blue failed to provide this

6

information, Detterman stated that she was expected to report to work on September 5, 2000 or would be considered AWOL. (Blue Dep. Ex. 9, Docket No. 32-3 at 28.)

Blue did not provide any additional medical documentation and did not report for work on September 5, 2000. (Blue Dep. 88; Blue Dep. Ex. 11, Docket No. 32-3 at 31.) Blue did not report to work because she was under Dr. Ulrich's care and he had not released her to work. (Blue Dep. 91-92.)

HUD was prepared to initiate disciplinary proceedings against Blue when it received Blue's request for LWOP dated August 26, 2000 wherein she requested leave until January 2, 2001. (Blue Dep. Ex. 11, Docket No. 32-3 at 31.) HUD had not received this request earlier because Blue had submitted it along with her request for workers compensation, which had been sent to the Department of Labor. (Blue Dep. Ex. 11, Docket No. 32-3 at 31.)

Detterman responded to Blue on December 22, 2000 and stated that Blue's request for leave was insufficient because it did not include medical evidence to substantiate her absence from September 5, 2000 through January 2, 2001. (Blue Dep. Ex. 11, Docket No. 32-3 at 32.) Therefore, Detterman gave Blue the opportunity to provide appropriate medical evidence to support her need for leave. (Blue Dep. Ex. 11, Docket No. 32-3 at 32.) Detterman instructs Blue to submit this information no later than January 3, 2001 and a failure to provide this information may result in her being classified as AWOL and disciplined. (Blue Dep. Ex. 11, Docket No. 32-3 at 32.)

Dr. Ulrich and Ford wrote in a letter dated December 28, 2000 that reads in its entirety:

> Ms. Delores Blue continues to be unable to return to work due to her depression, eating disorder and chronic pain as a result of her work related injury. She began treatment March 2, 2000, continues to experience pain and depression, and is not ready for discharge from psychiatric care at this time. Expected date of discharge is unknown and is contingent upon improvement of her physical condition.

(Blue Dep. Ex. 12, Docket No. 32-3 at 34.)

Blue wrote in a letter to Detterman dated January 2, 2001 that reads in its entirety:

7

> While my injury occurred during the performance of duty as a Program Support Assistant for the U.S. Department of Housing and Urban Development in the Milwaukee, Wisconsin.
>
> I am requesting "Reasonable Accommodation" of "Advance Sick Leave" for 240 hours, due to physical illnesses of chronic work-related bilateral hand and wrist pain, severe anemia, eating disorder and major recurrent depression.
>
> As I continue to be unable to return to work, due to my depression, eating disorder and chronic pain, as a result of my work-related injury. I am asking you to please provide me with a prompt written response of your approval or disapproval regarding my request of Advance Sick Leave. Thank you in advance.

(Blue Dep. Ex. 13, Docket No. 32-3 at 35.) This letter indicates that courtesy copies were sent to "Senator Kohl" and "Senator Feingold."

In a letter dated January 12, 2001, Dawn Davis ("Davis"), the Director of the Program Support Division, stated that she had received Blue's request but is unable to approve it because Blue failed to provide an approximate date as to when she might return to duty.

In a letter dated January 25, 2001, HUD requested Dr. Neal Presant, the clinical director of the Federal Occupational Health Administration to evaluate Blue's medical records to determine whether the records provided are sufficient from a medical standpoint to support Blue's continued absence from work. (Blue Dep. Ex. 15, Docket No. 32-3 at 37.) On January 31, 2001, HUD requested Blue provide a medical release to permit Dr. Peasant to discuss Blue's medical conditions with her doctors. (Blue Dep. Ex. 16, Docket No. 32-3 at 41.)

On February 10, 2001, Blue signed a medical release authorizing Doctors Ulrich, Kroner, and Neni to provide certain medical information. (Blue Dep. Ex. 17, Docket No. 32-3 at 43.) Blue limited the information these doctors could disclose by writing, "Please provide only information pertaining to my disability, due to my work-related injury that requires a reasonable accommodation under the American Disability Act (ADA)." (Blue Dep. Ex. 17, Docket No. 32-3 at

8

43.) Although Ford, Blue's therapist, signed this form as a witness, the form does not appear to authorize the release of information from Ford. (Blue Dep. Ex. 17, Docket No. 32-3 at 43.)

In a letter dated February 13, 2001, Blue wrote to Davis stating that her psychological problems were secondary to her hand and wrist conditions. (Blue Dep. Ex. 18, Docket No. 32-3 at 44.) Blue states that she has continued to experience

> severe pain tenderness and soreness in my hands, wrist, shoulder and neck, to no avail. I am unable to grasp, grip, pull, carry, or lift any object without severe pain that radiate down my neck, shoulder, arm wrist and fingers. I am unable to do any repetitive movements without excruciating pain in my bilateral hand, wrist, shoulder and arm. The pain is sporadic and persistent and is continuing to get worse.

(Blue Dep. Ex. 18, Docket No. 32-3 at 45.)

On March 8, 2001, Dr. Presant submitted a letter in which he concluded that the medical evidence provided by Blue was sufficient to support the conclusion that Blue was prevented from coming to work, and therefore, Dr. Presant recommended that Blue be considered on LWOP rather than AWOL. (Blue Dep. Ex. 19, Docket No. 32-3 at 47.) However, Dr. Presant continued and stated that there was "no apparent accommodation that could be made to allow her to return" and in light of the fact that Blue had already been off for so long, it was "extremely unlikely that she will be returning to work as a Program Support Assistant at HUD in the foreseeable future." (Blue Dep. Ex. 19, Docket No. 32-3 at 47.)

In a letter dated April 27, 2001, Davis informed Blue that Davis is proposing that Blue be removed from her position with HUD. (Blue Dep. Ex. 21, Docket No. 32-3 at 48.) In this letter Davis states that Blue had been on approved LWOP since January 27, 2000, but that during this time Blue has failed to provide adequate medical documentation of her medical condition and her likely return to work date. (Blue Dep. Ex. 21, Docket No. 32-3 at 48.) Davis refers to the conclusions of Dr. Presant and states that it appears that Blue's severe chronic pain would keep her

9

from returning to work and there are no accommodations that would enable Davis to return to work. (Blue Dep. Ex. 21, Docket No. 32-3 at 49.) Further, it does not appear likely that Blue will be able to return to work in the foreseeable future. (Blue Dep. Ex. 21, Docket No. 32-3 at 49.) Davis states that LWOP should only be granted when it is reasonably expected that the employee will return to duty and that continuing to grant leave with no foreseeable end is unreasonable, particularly when Blue has already been granted leave of more than fourteen months. (Blue Dep. Ex. 21, Docket No. 32-3 at 49.) Davis states that Blue's position is urgently needed elsewhere and HUD is unable to hold open her position indefinitely. (Blue Dep. Ex. 21, Docket No. 32-3 at 49-50.) Finally, Davis informs Blue that she may respond to this proposal by must do so within twenty-one calendar days and if she needs additional time, she should contact HUD within the twenty-one day period and set forth her reasons for an extension. (Blue Dep. Ex. 21, Docket No. 32-3 at 50.)

More than a week past the twenty-one day period expired, an attorney contacted HUD on Blue's behalf requesting an extension of time to file a response. (Blue Dep. Ex. 22, Docket No. 32-3 at 52.) However, Ben Johnson ("Johnson"), Deputy Director of HUD's Denver Homeownership Center, denied this request for an extension because Blue's attorney did not provide any explanation as to why an extension was necessary. (Blue Dep. Ex. 22, Docket No. 32-3 at 52.)

In a letter dated June 19, 2001, Johnson accepted Davis' recommendation and removed Blue from federal service effective June 20, 2001. (Blue Dep. Ex. 22, Docket No. 32-3 at 52.) Johnson states that Blue's removal is because the information provided by her medical practitioners demonstrates that Blue is unable to return to work and unlikely to be able to return to work at any point in the foreseeable future. (Blue Dep. Ex. 22, Docket No. 32-3 at 52.) Further, there is no apparent accommodation that could be made that would enable Blue's return to work. (Blue Dep. Ex. 22, Docket No. 32-3 at 52.)

Blue had further surgery on her hands in 2004 and 2005. (Blue Dep. 28.) Since her last surgery, Blue has developed arthritis in both her hands. (Blue Dep. 30.) Following her termination from HUD, Blue worked for Milwaukee County Child Support Enforcement as part of a requirement under the W-2 program. (Blue Dep. 19-20.) Blue worked in this position from April of 2005 to September of 2005. (Blue Dep. 19-20.)

**SUMMARY JUDGMENT STANDARD**

A motion for summary judgment will be granted when there are no genuine issues as to material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). As provided under Rule 56(c), only "genuine" issues of "material" fact will defeat an otherwise "proper" motion for summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Material facts are those facts which, under the governing substantive law, might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of such material facts is "genuine" if the evidence is such that a reasonable trier of fact could find in favor of the nonmoving party. Id.

The movant bears the burden to establish that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970); see also Celotex Corp., 477 U.S. at 323. The moving party satisfies its burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson, 477 U.S. at 255; Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988); Spring v. Sheboygan Area School Dist., 865 F.2d 883, 886 (7th Cir. 1989). Further, "on summary judgment, a court can neither make a credibility determination nor choose between competing interests." Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1041 (7th Cir. 1993).

If the moving party meets its burden, the nonmoving party then has the burden to present specific facts showing that there is a genuine issue of material fact. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

**ANALYSIS**

Blue alleges that the defendant's failure to grant her 240 hours of advance sick leave and termination of Blue's employment (1) denied her "equal terms, conditions and privileges of employment because of her disability;" (2) denied her "equal terms, conditions and privileges of employment because of her" prior equal employment opportunity ("EEO") activity; (3) "discriminated against [her] because of her disability;" and (4) "retaliated against [her] on account of her prior EEO activity." (Amend. Compl. ¶¶12, 14-15, Docket No. 20 at 2-3.)

Blue brings her claims under Section 501 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791 et. seq. (Amend Compl. ¶2, Docket No. 20 at 1.) The Rehabilitation Act provides that any person bringing a claim under the Act shall have the "remedies, procedures, and rights" set forth in Title VII of the Civil Rights Act of 1964. 29 U.S.C. § 794a(a)(1). Further, Section 601 of the Rehabilitation Act requires the federal government to accommodate disabled employees and instructs that the standards used to determine whether this section has been violated shall be the standards applied under Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111 et. seq., and the provisions of sections 501 through 504, and 510 of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12201-12204 and 12210, as those sections relate to employment. 29 U.S.C. § 791(g).

An employer discriminates against a person with a disability when it fails to accommodate the disability of an otherwise qualified individual, provided such accommodation would not impose an undue hardship upon the employer. 42 U.S.C. § 12112(b)(5)(A); Hoffman v. Caterpillar, Inc., 256 F.3d 568, 572 (7th Cir. 2001). The plaintiff must demonstrate that she is an otherwise qualified

individual with a disability, that her employer was aware of her disability, and that her employer failed to accommodate it. Hoffman, 256 F.3d at 572; EEOC v. Sears, Roebuck & Co., 417 F.3d 789, 797 (7th Cir. 2005). "As to the third element, the 'ADA requires that employer and employee engage in an interactive process to determine a reasonable accommodation.'" Sears, 417 F.3d at 797 (quoting Baert v. Euclid Beverage, Ltd., 149 F.3d 626, 633 (7th Cir. 1998)). Reasonable accommodations may include:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

The defendant argues that Blue cannot demonstrate that she was a "qualified individual with a disability" because she was not able to perform the essential duties of her job with or without a reasonable accommodation. See 42 U.S.C. § 12111(8). The defendant further argues that the accommodation requested by Blue, an additional 240 days of advanced sick leave, was unreasonable.

Plaintiff bears the burden of establishing that she was qualified to perform her job duties at the time of her termination. Corder v. Lucent Technologies Inc., 162 F.3d 924, 928 (7th Cir. 1998). "The term 'qualified individual with a disability' means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

In this case, the reasonable accommodation plaintiff is seeking is leave from work. Temporary leave may be a reasonable accommodation. Haschmann v. Time Warner Entertainment Co., 151 F.3d 591, 601 (7th Cir. 1998). In Haschman, the Seventh Circuit affirmed a jury verdict

and held that there was sufficient evidence from which a reasonable juror could conclude that a request for medical leave of two to four weeks was a reasonable accommodation when the medical evidence indicated that the plaintiff would be able to return within that time, the job was vacant for "many months" before the plaintiff was hired, it took six-months following the plaintiff's termination to hire a replacement, and during these times the plaintiff's job was handled by others. Id. at 601-02.

However, the Seventh Circuit has also held that

> [t]he ADA does not require an employer to accommodate an employee who suffers a prolonged illness by allowing him an indefinite leave of absence. See Christian v. St. Anthony Medical Center, Inc., 117 F.3d 1051, 1053 (7th Cir. 1997) (stating that the ADA does not protect an employee from being fired because of illness); see also, Rogers v. International Marine Terminals, Inc., 87 F.3d 755, 759 (5th Cir. 1996) (stating that nothing in the ADA requires an employer to accommodate an employee with an indefinite leave of absence and that because the plaintiff could not attend work, he was not a "qualified individual with a disability" under the ADA).

Nowak v. St. Rita High Sch., 142 F.3d 999, 1004 (7th Cir. 1998).

In Nowak, the Seventh Circuit affirmed the district court's grant of summary judgment and held that a high school teacher was not a "qualified individual" when he was unable to perform an essential function of his position, that being regular attendance, when he had been absent for more than eighteen months. Id. at 1003-04. However, these absences were not consecutive, but rather the plaintiff worked days intermittently. Id. at 1001.

Under the circumstances of this case, from the defendant's perspective, there was absolutely no evidence to indicate that granting 240 hours of additional leave would result in Blue being able to return to work in any capacity. In fact, all information known to the defendant at the time Blue was terminated indicated that granting additional leave would have been futile. The continuing pattern here is that Blue would request and be granted leave, and then when the time had expired, Blue would request additional leave. (See Blue Dep. 53; Blue Dep. Exs. 1, 6, 9, 11, 13, Docket No.

14

32-3 at 5, 25, 28, 31, 35.) The information received from Blue's medical providers was consistent in that her recovery date was undetermined. (See Blue Dep. Exs. 1, 4-5, 12, Docket No. 32-3 at 4, 23-24, 34; Blue Dep. 52.) No medical provider could state with any certainty when Blue might be able to return to work. There was nothing to indicate that Blue's recovery was imminent or that the 240 additional hours was anything but another arbitrarily chosen number.

If the circumstances of this case were such that Blue made one request for six weeks of leave, it would be unlikely that summary judgment would be appropriate; the question of whether or not this leave request was a reasonable accommodation would be sent to a jury for resolution. Parenthetically, had this been about a solitary request for six weeks, there would be no case because Blue would not have been terminated. Instead, the issue in this case is whether a request for continued leave of six weeks is a reasonable accommodation when the employee has already been granted incremental leaves totaling roughly a year, and there is no indication that the employee will be able to return to work at the end of the requested leave.

To view it another way, had Blue in January of 2000 requested and been denied an indefinite leave of absence, she would be unable to argue HUD denied her a reasonable accommodation. Nowak, 142 F.3d at 1004. Although it came incrementally, the net effect of Blue's continued requests for extensions of her leave was no different than requesting an indefinite leave from her position with HUD. When an employee seeks to obtain indefinite leave by utilizing repeated requests for short leaves, at some point the requested extension, even if that request is for a relatively short period of time, is no longer a reasonable accommodation. Provided that there is no reason to believe that the present request for leave is distinguishable from the past requests and it is uncertain that the employee will be able to return to work at the end of the leave, the employer need not continue to grant the employee's requests for leave simply because they come in small increments.

The facts of this case demonstrate that Blue's request for an additional six weeks of leave was just another request adding up to indefinite leave and therefore HUD was not required to grant her leave. There is no evidence in the record indicating that Blue would have been able to return to work on February 14, 2001, the approximate date Blue would have been expected to return to work if her 240 hour leave had been granted, other than her own statement. (See Blue Dep. 122.) Even so, Blue never communicated her belief that she could return to work to HUD. She states she failed to inform HUD because she believed she had to wait for Dr. Presant's determination. (Blue Dep. 122.)

Blue's assertion in her deposition that she believed she could return to work in January of 2001 is completely unsupported by the medical evidence available at that time and is contradicted by Blue's contemporaneous statements. As such, her statements are insufficient to create a dispute of material fact.

Dr. Ulrich and Ford wrote in a letter dated December 28, 2000 that reads in its entirety:

> Ms. Delores Blue continues to be unable to return to work due to her depression, eating disorder and chronic pain as a result of her work related injury. She began treatment March 2, 2000, continues to experience pain and depression, and is not ready for discharge from psychiatric care at this time. Expected date of discharge is unknown and is contingent upon improvement of her physical condition.

(Blue Dep. Ex. 12, Docket No. 32-3 at 34.)

Blue wrote in a letter to Detterman dated January 2, 2001 that reads in its entirety:

> While my injury occurred during the performance of duty as a Program Support Assistant for the U.S. Department of Housing and Urban Development in the Milwaukee, Wisconsin.
>
> I am requesting "Reasonable Accommodation" of "Advance Sick Leave" for 240 hours, due to physical illnesses of chronic work-related bilateral hand and wrist pain, severe anemia, eating disorder and major recurrent depression.
>
> As I continue to be unable to return to work, due to my depression, eating disorder and chronic pain, as a result of my work-related injury. I am asking you to please provide me with a prompt written response of your approval or disapproval regarding my request of Advance Sick Leave. Thank you in advance.

16

(Blue Dep. Ex. 13, Docket No. 32-3 at 35.)

In a letter dated February 13, 2001, Blue wrote to Davis and stated she has continued to experience

> severe pain tenderness and soreness in my hands, wrist, shoulder and neck, to no avail. I am unable to grasp, grip, pull, carry, or lift any object without severe pain that radiate down my neck, shoulder, arm wrist and fingers. I am unable to do any repetitive movements without excruciating pain in my bilateral hand, wrist, shoulder and arm. The pain is sporadic and persistent and is continuing to get worse.

(Blue Dep. Ex. 18, Docket No. 32-3 at 45.)

Finally, Dr. Presant concluded on March 8, 2001, after having consulted with Blue's treating medical professionals and reviewing Blue's medical record, that there was "no apparent accommodation that could be made to allow her to return" and in light of the fact that Blue had already been off for so long, it was "extremely unlikely that she will be returning to work as a Program Support Assistant at HUD in the foreseeable future." (Blue Dep. Ex. 19, Docket No. 32-3 at 47.)

Therefore, it is abundantly clear that any additional leave was unlikely to enable Blue to return to work. As such, there was no demonstrable need for a reasonable accommodation by way of leave from work. Absent a need for an accommodation, Blue's claim that HUD discriminated by failing to provide her with an accommodation is meritless.

Furthermore, the defendant has demonstrated that permitting Blue to take indefinite leave would impose an undue hardship for the employer. When an employer is seeking to demonstrate that an employee's request for indefinite leave would impose an undue hardship upon the employer, surely an employer need not demonstrate much for such undue hardship is ordinarily self-evident. It would be the exceptionally rare position that could be left open permanently for whenever and if ever, the employee previously filling the position would return. In the present case, Davis wrote in a

17

letter to Blue dated April 27, 2001, "Due to changing workload priorities, in order to meet out workload demands and to provide necessary services, your position is now urgently needed elsewhere by the Field Operations Branch to perform higher priority duties. Therefore, for the efficiency of the service I cannot continue to carry you on our employment rolls in a prolonged LWOP status indefinitely." (Blue Dep. Ex. 21, Docket No. 32-3 at 50.) (See also Blue Dep. Ex. 22, Docket No. 32-3 at 53) ("It has been clearly explained to you that your inability to be available for duty is detrimental to the efficiency of the service and impacts on the ability of the Field Operations Branch to meet workload demands.") Therefore, no reasonable jury could conclude that indefinite leave was a reasonable accommodation, and thus summary judgment in favor of the defendant is appropriate. Further, Blue has failed to establish a prima facie case by demonstrating that she was otherwise qualified for her position because the evidence demonstrates that Blue was unable of performing the essential job function of regular attendance and thus for this reason as well summary judgment in favor of the defendants is appropriate.

The court's determination regarding a reasonable accommodation and that Blue was not an otherwise qualified individual with a disability resolves nearly all of Blue's claims in favor of the defendant. However, Blue also alleges that she was denied "equal terms, conditions and privileges of employment" and "retaliated against on account of her prior EEO activity." (Amend. Compl. ¶¶ 14-15, Docket No. 20 at 2-3.)

Although Blue's amended complaint sets forth these claims relating to Blue's prior EEO activity, Blue's response to the defendant's motion for summary judgment makes no effort to respond to the defendant's motion as to these claims. (See Reply, Docket No. 42 at 9.) This lack of a response may well be a consequence of the fact the Blue is apparently unable to recall any details of her prior EEO complaints. When asked during her deposition about her prior EEO complaints Blue could not recall when she made these complaints or even how many complaints she filed.

(Blue Dep. 205-06.) Blue estimates that she may have made these complaints in 1994 or 1995 and they related to her prior supervisor allegedly referring to her as an "adversary," a word for which Blue did not know the meaning. (Blue Dep. 206-07.) Blue may have continued to file EEO complaints after this time but cannot recall. (Blue Dep. 210.) There is no indication as to what was the basis for any other complaints. None of the persons involved in the decision to terminate Blue were involved in Blue's prior EEO complaints. (Blue Dep. 208, 211.)

Blue fails to set forth any evidence that would indicate that HUD took an adverse employment action against her because of her prior EEO activity. Rather, the substantial amount of time that had elapsed between Blue's prior EEO activity and her termination, perhaps as much as seven years, indicates that there was no relationship between the two actions. See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) ("Action taken . . . 20 months later suggests, by itself, no causality at all."); see also Fyfe v. City of Fort Wayne, 241 F.3d 597, 603 (7th Cir. 2001) ("In the absence of any other evidence of a causal link, the 18-month interval in this case is insufficient proof of causation.") (citing Hughes v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (4 months insufficient); Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 321 (7th Cir. 1992) (6 months insufficient).

**IT IS THEREFORE ORDERED** that the defendant's motion for summary judgment is **granted**. Blue's complaint and this action are hereby **dismissed** with prejudice. The clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 12th day of June, 2007.

s/AARON E. GOODSTEIN<br>
U.S. Magistrate Judge